IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


BNSF RAILWAY CO.,
              Plaintiff,

       vs.                                                    No. 17-2602-JTM

CITY OF AUGUSTA, KANSAS,
              Defendant.


MEMORANDUM AND ORDER


On March 1, 2016, an electrical line belonging to the City of Augusta, Kansas fell across railroad tracks owned by BNSF Railway Company. The line sent a high-voltage current through the tracks, damaging BNSF signaling equipment, and generating the present lawsuit. BNSF alleges the line fell because of a faulty clamp, and that the City failed to properly inspect, maintain and ensure the safety of the power line. BNSF also advances a claim of trespass, as it gave no permission for the City to run the line across its property.

The matter is before the court on the City's motion for summary judgment (Dkt. 57). The City argues (1) it is immune for its discretionary acts under the Kansas Tort Claims Act, K.S.A. 75-6104(e); (2) plaintiff BNSF has failed to show that the accident happened because of flawed maintenance or inspection; (3) res ipsa loquitor is inapplicable; (4) it had a prescriptive easement to place the line across BNSF property.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).

2

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

The City of Augusta, Kansas, an incorporated municipality with home rule power under the Constitution of the State of Kansas, owns and operates its own electrical plant and distribution system. This system includes power lines that extend along and across BNSF's property.

On or about the morning of March 1, 2016, a "hot line clamp" that attaches a tap line into the main power conductor that crosses over BNSF's railroad tracks failed. This resulted in a one-time high resistance connection that caused localized melting of the hot line clamp's primary vise.[1] This high resistance connection burned and severed one of the main power lines that crosses BNSF's tracks. The severed power line then fell onto BNSF's tracks and energized the tracks resulting in damage to BNSF's signal equipment.

BNSF's response to the City's motion relies on the conclusions of its expert, Andrew Neuhalfen (Ph.D.). According to Neuhalfen, the hot line clamp—an eye bolt

---

[1] BNSF disputes both the relevance and factual accuracy of the City's assertion that the failure "'resulted in a *one-time* high resistance connection.'" (Dkt. 60 at 2, quoting and adding emphasis to Dkt. 58, ¶ 8). The court finds that the fact is uncontroverted. An expert metallurgist, Michaela Kuba, described the event as "a one-time failure." The City's expert witness Ghattis Bitar stated that the high resistance connection was "the result of [a] one time event." In addition, the court notes that BNSF does not controvert the subsequent factual allegation in the City's memorandum (¶ 24) that "the fractured eye bolt on the hot line clamp was a one-time failure with no evidence of fatigue or other time-dependent phenomena."

providing pressure on a primary vise mechanism—acts as an electrical junction to transfer electricity from the main power line to the residential tap line. Here, according to Neuhalfen, the clamp was subjected to "electrical fault" activity outside of normal operating conditions. Such a fault includes overvoltage conditions where electrical voltage rises to such a level that various equipment subject to that overvoltage condition become damaged. Neuhalfen states that the fault fractured the shaft of the eye bolt and loosened the connection between the clamp and the power line. This loose connection, in turn, caused the high-resistance connection which generated the heat which severed the power line.

There is a dispute as to how much warning time might have been available to the City. According to Neuhalfen, this heating would not have been instantaneous, but occurred over "an extended period of time," which he defined as "days or hours." He further testified that, with proper instrumentation, one can observe a heating connection occurring.

The City's expert, Ghattis Bitar, testified that, given the approximate melting temperature of aluminum and the much higher temperature produced by this arcing event, the hot-line clamp would have begun to melt almost instantaneously. The City's other expert, Gerald Hager, stated that inspecting the clamp might have prevented the accident, but he did not know: "if you inspect them [hot line clamps], there's no assurance that it would have prevented the failure. It could have broken and failed shortly after you inspect it, and it still wouldn't guarantee that you would prevent failure."

This incident occurred between Mile Post 184 and Mile Post 186 in the Emporia Subdivision of the Kansas Division Line near the BNSF Station located in Augusta.

The downed power conductor automatically de-energized within less than a second due to the safety relay system that the City of Augusta employed.[2] However, there is some evidence that, even if the current energized the rails for less than a second, it could still have caused significant property damage.

The failure of the hot line clamp and severed power line caused the power to go out throughout the City of Augusta, including at city hall. After the incident, the City began to receive phone calls notifying it that the power was out in the City. The City Clerk, Erica Jones, also received a call on her personal cell phone from a BNSF employee notifying her that the there was a power line down on BNSF's tracks. City maintenance workers responded to the site and, within approximately 45 minutes, had repaired the downed power line.

Prior to this incident, the City had received no reports of any problems, abnormalities, customer concerns, or emergency calls from customers served by the main or tap lines in question. It was not notified of any reports of blinking lights from electric customers served by the tap fed by the subject hot line clamp prior to its failure.

---

[2] BNSF disputes this conclusion, relying on its expert, Neuhalfen. But Neuhalfen's testimony that the power-cutoff safety did not work was not his own conclusion, it was simply his "understanding." And this understanding was not premised on admissible evidence:

> That was one of the initial questions that I had posed to Mr. Quinn [counsel for plaintiff] as to when the power line failed, did it de-energize the system? And he said that it did not.

One of the primary methods of identifying potential failures or reliability issues in power lines and related components is to conduct visual surveillance.

The City's electrical distribution department employees conduct visual surveillance on the City's power lines and related equipment throughout their work days.

The employees of other City departments such as the police department, help the inspection process by reporting incidents such as arcing on the lines at night.

The National Electrical Safety Code (NESC), adopted by reference under K.A.R. § 82-12-2, leaves decisions regarding frequency and methods of inspection schedules to the discretion of the City.

It is uncontroverted that the City's inspection practices are consistent with the majority of small municipal and rural electrical utilities in the United States.

On September 2, 2016, BNSF served the City with a notice pursuant to K.S.A. 12-105b(d) claiming that the City was negligent in failing to properly maintain, inspect, and prevent the power line from contacting BNSF's track.

A metallurgical analysis of the subject hot line clamp revealed no evidence of negligence in the installation or maintenance of the clamp, that improper installation was not a cause of the clamp's failure, that there were no wear marks that would indicate a loose connection on the clamp, and that the fractured eye bolt on the hot line clamp was a one-time failure with no evidence of fatigue or other time-dependent phenomena.

Neuhalfen has no evidence that the City's installation caused the electrical fault or failure of the hot line clamp.

It is uncontroverted that, after conducting a search for all applicable written agreements between the City and BNSF or its predecessors permitting the City to construct, maintain or otherwise use its power lines across BNSF's property, BNSF did not locate any such easements, licenses or written agreements permitting the City to do so. Further, the City has not produced or identified any easements, licenses or agreements pertaining to the power line at issue, and the City has not received BNSF's consent, express or implied, to maintain and continue to use its power line across BNSF's property.

David Warner is the City's supervisor over electric distribution. He has been employed with the City for at least 25 years. Although the precise date of construction is unknown, the power lines and poles relevant to this action have been in continuous use for at least the amount of time that Warner has been employed with the City. The City has openly transported electricity to its customers through the subject power lines, and operated its electric distribution system, including the use of the subject power lines, under a belief that it owned a right of way in the easement across BNSF's tracks.

**Conclusions of Law**

Both parties agree that, as the operator of a municipal power utility, the City owes the highest duty of care to the public. *See Webb. v. City of Oswego*, 149 Kan. 156, 86 P.2d 553 (1939). However, the City argues that BNSF's negligence claims, whether advanced

7

under a classic negligence standard or established by *res ipsa loquitor*, are subjection to dismissal under the discretionary function immunity provided by the Kansas Tort Claims Act, K.S.A. 65-6014(e), as articulated most recently in *Thomas v. Shawnee County Com'rs*, 293 Kan. 208, 262 P.3d 336 (2011).[3] The City stresses that NESC standards provide no express provision for the frequency or method of line inspections, but leave the issue to the discretion of owners and operators of similar utilities.

BNSF argues that *Thomas* is inapplicable, and argues that the court is bound to follow an earlier decision of the Kansas Court of Appeals, *Lamb v. City of Elsmore*, 18 Kan.App.2d 641, 857 P.2d 1380 (1993). In *Lamb* the court held that discretionary function immunity under the KTCA was not available to the defendant city operator of an electrical utility, because of the high degree of care recognized in cases such as *Webb*. Because of that independent duty, "the City had no discretion." 857 P.2d at 1384.

In responding to the City's additional argument that the court in *Lamb* also stressed evidence showing that the utility in that case had violated NESC standards, BNSF cites several cases, *see Cerretti v. Flint Hills Rural Elec. Co-op Ass'n*, 251 Kan. 357, 837 P.2d 339 (1992); *Estate of Belden v. Brown County*, 46 Kan.App.2d 247, 276, 261 P.3d 943 (2011), and argues that the determination of whether a duty has been violated is ordinarily a matter for the jury.

---

[3] The City argues alternatively that BNSF has failed to show facts which would support a conclusion that any negligence by the City caused injury to BNSF. Because the court finds that discretionary immunity applies, it need not resolve the issue.

But this confuses the question of whether a given duty of care was breached (a jury question) with the separate legal question of whether a given duty was sufficiently discretionary that immunity exists under the KTCA. As to the cases cited by BNSF, the general KTCA discretionary immunity under K.S.A. 75-6104(e) was either not in issue at all (*Cerretti*), or was rendered after the court had explicitly determined that "the discretionary function exception is legally inapplicable to the circumstances of this case" because a more specific provision of the KTCA (K.S.A. 75-6104(d)) applied (*Belden*). Thus, both cases simply stand for the proposition that the issue of negligence is typically a jury question. But, of course, discretionary immunity can apply even if a duty of care is breached or, in the language of the statute, "whether or not the discretion is abused."

Why should the court apply *Lamb* and ignore *Thomas*? BNSF's answer is based on silence, since the "*Lamb* decision is notably absent from the Supreme Court's analysis or holding in *Thomas*." (Dkt. 60, at 12). This is technically true: *Lamb* is not directly mentioned. But *Thomas* does criticize language from "certain earlier cases," including for example ("*e.g.*") cases such as *Nero v. Kansas Sate University*, 253 Kan. 567, 585, 816 P.2d 768 (1993), to the extent that those cases created "some ambiguity" by suggesting that discretionary immunity is defeated simply by the existence of an independent legal duty. As the court explained, "the existence of an 'independent' legal duty is an explicit consideration for the KTCA personnel policy exception, *not its discretionary duty exception*." 262 P.3d at 353 (emphasis added).

But of course *Nero* did not create that ambiguity on its own. It imported the idea

of "independent legal duty" from *Dougan v. Rossville Drainage District*, 243 Kan. 315, 322-

25, 757 P.2d 272 (1988) ("a governmental agency does not have a discretionary right to

violate a legal duty and avoid liability") — the very same case which underlies *Lamb*. See

857 P.2d at 1383 (citing *Dougan*, 243 Kan. at 322 ("discretionary function exception is not

applicable in those cases where a legal duty exists"). It is implausible to assume that the

Kansas Supreme Court intended to prune only one branch of an ambiguous tree.

To the contrary, the court is obliged to determine whether the City's duty was

discretionary in nature. "Regardless of the difficulty [in distinguishing between

ministerial and discretionary acts], *the differentiation must be made* to avoid nullification of

the discretionary function in all negligence cases." *Thomas*, 262 P.3d at 354. And if the

court must consider discretionary immunity in light of *Thomas*, and plaintiff has shown

no good reason why it should not, the issue becomes whether the allegedly violated duty

in the present action was discretionary or ministerial in nature.

The distinction was addressed at length in *Thomas*, and the discussion is helpful

here:

> In order to determine whether a function or duty is discretionary for
> purposes of the KTCA, "Kansas courts look foremost to the nature and
> quality of the discretion exercised." *Soto* [*v. City of Bonner Springs*], 291 Kan.
> [73] 79, 238 P.3d 278 [(2010)] (citing *Bolyard v. Kansas Dept. of SRS*, 259 Kan.
> 447, 452, 912 P.2d 729 [1996]; *Robertson v. City of Topeka*, 231 Kan. 358, 361–
> 62, 644 P.2d 458 [1996]). Further, "[t]he mere application of any judgment is
> not the hallmark of the exception." *Soto*, 291 Kan. at 79, 238 P.3d 278 (citing
> *Allen v. Kansas Dept. of SRS*, 240 Kan. 620, 623, 731 P.2d 314 [1987]). But
> "[t]he more a judgment involves the making of policy[,] the more it is of a

'nature and quality' to be recognized as inappropriate for judicial review." *Kansas State Bank & Tr. Co.* [. Specialized Transp. Serv.], 249 Kan. [348,] 365, 819 P.2d 587 {(1991)]. The necessity that the actor employ expertise, whether educational or experiential, also is relevant to determining whether an action is discretionary or ministerial. *See Allen*, 240 Kan. at 623, 731 P.2d 314 (employee's action not discretionary when decision on how to clean vomit from floor did "not invol[ve] any particular skill or training"). Negligent performance of a ministerial act is not within the protective orbit of the discretionary function exception. *See Nero*, 253 Kan. at 587, 861 P.2d 768 (quoting *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 315, 757 P.2d 272 [1988]).

As Professor William E. Westerbeke has observed, several principles guide application of the discretionary function exception by Kansas courts: (1) "[T]he discretionary function primarily involves policy-oriented decisions and decisions of such a nature that the legislature intended them to be beyond judicial review," (2) "the immunity does not depend upon the status of the individual exercising discretion and thus may apply to discretionary decisions made at the operational level as well as at the planning level," and (3) "the discretionary function does not encompass conduct that is deemed 'ministerial,' i.e., conduct that involves no discretion." Westerbeke, *The Immunity Provisions in the Kansas Tort Claims Act: The First Twenty–Five Years*, 52 Kan. L.Rev. 939, 960 (2004).

This court also has repeatedly put emphasis on the mandatory versus permissive character of direction given to the defendant actor. "[W]here there is a 'clearly defined *mandatory* duty or guideline, the discretionary function exception is not applicable.'" (Emphasis added.) *Soto*, 291 Kan. at 80, 238 P.3d 278 (quoting *Nero*, 253 Kan. at 585, 861 P.2d 768; and citing *Barrett v. U.S.D. No. 259*, 272 Kan. at 263, 32 P.3d 1156; *Kansas State Bank & Tr. Co.*, 249 Kan. at 365, 819 P.2d 587). For purposes of the exception, "[a] *mandatory* guideline can arise from agency directives, case law, or statutes." (Emphasis added.) *Soto*, 291 Kan. at 80, 238 P.3d 278 (citing *Barrett*, 272 Kan. at 263, 32 P.3d 1156; *Bolyard*, 259 Kan. at 452–54, 912 P.2d 729). Such a guideline leaves little to no room for individual decision making, exercise of judgment, or use of skill, and qualifies a defendant's actions as ministerial rather than discretionary. *See Nero*, 253 Kan. at 593–94, 861 P.2d 768 (citing *Dougan*, 243 Kan. at 322–23, 757 P.2d 272) (ministerial act "performance of some duty involving no discretion" where discretion defined as "capacity to distinguish between what is right and

wrong, lawful and unlawful, or wise or foolish sufficiently to render one amenable and responsible for his acts").

262 P.3d at 353-54.[4]

Under these standards, the defendant is entitled to discretionary immunity. The plaintiff has identified no specific employees of the City who breached a duty, and has identified no error in the installation or design of the hot line clamp at issue. The only particular breach of duty suggested by BNSF is inadequate inspection of the hot clamp. The evidence before the court is that, in order to prevent such accidents, inspections of the line would have to occur on a daily or possibly hourly basis. And even then, such inspections would not guarantee detection of a dangerous hot clamp, but would simply reduce the chances of an accident.

There is, in the words of *Soto* adopted in *Thomas*, no "clearly defined mandatory duty or guideline" governing the frequency or method of line inspections. The uncontroverted evidence is that NESC standards commit such decisions to the operator of a utility, and that the City's inspection regime is similar to that of other municipalities. The frequency and method of inspections is a general, policy-oriented decision that requires weighing the dangers involved and the resources available. Such decisions

---

[4] In *Thomas*, the court court held that the county did not enjoy discretionary immunity as to a claim of negligence by two detention center officers who failed to preent a prisoner's suicide. Noting the Suicide Prevention policy applicable at the center, the court stressed that the first of the two officers "had no autonomy to choose not to do 15–minute checks, to choose not to conduct cell shakedowns, or to allow inmates to cover their cell door windows," and the second, though higher in authority as a shift supervisor, remained "a policy executor" rather than a "policy maker" who "had no discretion under … the policy." 262 P.3d at 355.

further require the employment of educational or experiential expertise and judgment, weighing issues of risks and costs.

Strikingly, BNSF presents *no argument* in its Response as to why, if *Thomas* is applicable, the court should deem the City's decsions as to its inspection policy a ministerial function rather than discretionary in nature. (Dkt. 60 at 12-13). Rather, it simply asserts that *Thomas* is inapplicable, and that *Lamb* controls. As noted above, the court finds that simply ignoring the later decision by the Kansas Supreme Court in favor of the earlier decision by the court of appeals is not the correct course, especially where the supreme court has mandated that "[r]egardless of the difficulty" in distinguishing between ministerial and discretionary functions, "the differentiation must be made." 262 P.2d at 354. This differentiation is mandatory, and BNSF gives the court no reason at all for concluding that City's actions were ministerial in nature.

Nor is this result is changed simply because a municipal power utility is held to the "highest degree of care" care under Kansas law. This is because the "highest degree" standard, which has also been applied in cases involving dangerous instrumentalities such as firearms, remains grounded in negligence, but with a recognition of the increased potential for harm from such instrumentalities. Commentators have recognized the lack of a clear distinction:

> The supreme court [in *Wood v. Groh*, 269 Kan. 420, 7 P.3d 1163 (2000),] emphasized that an important difference exists between the reasonable care standard used by the trial court and the 'highest degree of care' standard defining the duty to control dangerous weapons. Yet the court never explained how the 'highest degree of care' differs from reasonable care. An

examination of the 'highest degree of care' standard in the high power line cases in Kansas seems to suggest that 'highest degree of care' is simply another way to describe a reasonable care standard in which the heightened dangerousness of the instrumentality requires commensurately heightened precautions in order to satisfy reasonable care under all the circumstances.

W. Westerbeke and S. McAllister, *Survey of Kansas Tort Law: Part I*, 49 U. KAN. L.REV., 1037, 1064 (2001). In *Shirley v. Glass*, 297 Kan. 888, 308 P.3d 1, 9 (2013), the court extended the highest degree standard from earlier cases, involving an adult's duty to safeguard firearms from minors, to a case involving a merchant's sale of a handgun. In reversing the Court of Appeals' decision that the highest degree standard was not applicable, the Supreme Court indicated that underlying claim remains one of negligence, with the requirement that "gun owners exercise great caution in allowing access to their weapon." 297 Kan. at 901.

Citing RESTATEMENT (SECOND) OF TORTS, § 298 (1965)—the Restatement's basic "Want of Reasonable Care" provision—*Shirley* stressed that "*the standard is always one of 'reasonable care.'* This is the case whether the defendant is dealing with relatively innocuous items or with manifestly dangerous items, such as firearms. But what is reasonable depends in significant measure on the degree of harm that such an object likely poses." *Id*. (Emphasis added). Thus, the "highest degree of care" rules are "nothing more than particularized applications of general tort principles," under which "the law requires one to be as cautious as reasonably possible when dealing with an object that has obviously lethal capabilities." *Id*. (citing *Ransom v. City of Garden City*, 113 Idaho 202, 207, 743 P.2d 70 (1987)).

Thus, the duty imposed on a municipal power company is simply that of reasonable care, taking into account the dangerous nature of the product. This standard of care does not control the separate question of whether, in a given case, the action (or inaction) of a municipal power utility is discretionary or ministerial. For the reasons explained earlier, the court finds that in this case, the plaintiff has failed to show or explain why the inspection regime adopted by the City was anything other than a classic policy decision, entitled to discretionary immunity.

In addition to its negligence claims for damage, BNSF has also advanced a claim for trespass for the power line placed over its property, and asking for damages and an injunction against further encroachments. The City has moved to dismiss the claim, arguing that it has acquired a prescriptive easement given the length of time the line has been present. The City also argues that any trespass claim is further barred by applicable statutes of limitation and repose. BNSF argues that the City failed to present a defense of prescription in the pleadings and that it any event has not shown exclusive possession. It also argues that the reliance on the cited statutes of limitation and repose are inapplicable.

The court finds that BNSF's procedural argument should not bar addressing the issue of prescription. Although the City did not expressly mention the term "prescription" in its summary of defenses in the Pretrial Order, it does generally assert that the railroad's trespass claim has been defeated by the passage of time — being "barred by estoppel, laches, acquiescence, and/or waiver," as well as "barred … by the applicable statute of limitations and/or statute of repose." (Dkt. 56, at 8). Acquiescence is

directly suggestive of a prescriptive claim, as Kansas cases have frequently stressed that fact as an essential element for claims of prescription or adverse possession. *See Kratina v. Bd. of Comm'rs of Shawnee Cty.*, 219 Kan. 499, 504, 548 P.2d 1232, 1237 (1976) (noting critical distinction between 'permitting' the use, so it is not adverse, [and] 'acquiescing' in it so that it is adverse"); *Chainn v. Strait*, 173 Kan. 625, 630, 250 P.2d 806 (1952) "a permissive use, exercised in subordination to the owner's claim and ownership, as distinguished from acquiescence, cannot result in an easement by prescription, however long continued").

Even if the Pretrial Order did not suggest that some defense like prescription would be offered by the City, the proper solution would be to defer trial to allow the defense to be explicitly advanced rather to dismiss it for that reason alone. The court finds that a ruling now is appropriate, however, as BNSF's Response fails to offer any rationale for such a result, completely failing to demonstrate any prejudice arising from consideration of the issue or identifying some need for additional factual discovery under which it might defeat the claim.

Beyond its procedural argument, BNSF offers only a single reason not to accept the City's easement: the easement was not exclusive. (Dkt. 60, at 16). The court finds that this argument is insufficient to defeat the City's defense.

Where power lines have been continuously and openly present for the requisite prescription period, courts will presume their use was adverse to the landowner. *See Motes v. PacifiCorp*, 230 Or.Ap. 701, 710 217 P.3d 1071 (2009); *Cunningham v. Otero County*

16

*Elec. Co-op.*, 114 N.M. 739, 742 P.2d 833, 836 (1992) (given "continuous and uninterrupted use [of power line] for the prescriptive period," defendant was "entitled to a presumption that the use was adverse and under a claim of right"); *Sanchez v. Dale Bellamah Homes of N.M., Inc.*, 76 N.M. 526, 417 P.2d 25 (1966). Under such circumstances, courts will recognize the existence of prescriptive easements. *See Watkins v. Paragould Light & Water Com'n*, 2016 Ark.App. 432, 504 S.W.3d 606, 610 (2016); *Ex parte Lightwave Tech.*, 971 So.2d 712, 714 (Ala. 2007); *Heydon v. MediaOne*, 275 Mich.App. 267, 739 N.W.2d 373, 377 (2007); *Potomac Edison Co. v. Routzahn*, 192 Md. 449, 463, 65 A.2d 580, 586 (1949) (power company acquired prescriptive easement for "high tension power lines [in] open, uninterrupted, adverse use for much more than twenty years before this suit was instituted").

Nor is such an easement defeated by plaintiff's mere suggestion—without evidence—that the City's operation of the power line might not have been exclusive. In the present context, BNSF's operations on *terra ferma* would not establish a lack of exclusivity; the City's prescriptive easement would be defeated only there had been some interference with the power line itself.

Exclusive possession in favor of a power company arises in such circumstances if the evidence shows "no use was made of the easement by any person or entity other than the power company." *Virginia Elec. & Power Co. v. N. Virginia Reg'l Park Auth.*, 270 Va. 309, 318, 618 S.E.2d 323, 327 (2005) (quoting *Hise v. BARC Elec. Coop.*, 254 Va. 341, 492

S.E.2d 154, 157 (1997).[5] In contrast to a claim of adverse possession establishing title to

land in fee, a power company may acquire a prescriptive easement in a line even where

the landowner engages in various acts beneath that line. This is because

> a power line principally utilizes a space-way and is not terrestially located
> as is a railroad right of way. Beneath the suspended power line many
> activities entirely consistent with use by the power company may be carried
> on. These activities may be of a productive nature; ordinary observation
> discloses a variety of instances wherein the lands beneath power lines are
> utilized for purposes of the owners of the lands involved.

*Fla. Power Corp. v. McNeely*, 125 So. 2d 311, 317 (Fla. Dist. Ct. App. 1960).[6]

The court concludes that the defendant is entitled to discretionary immunity as to

plaintiff's claims of negligence, whether expressed as directly negligence or as established

by *res ipsa loquitor*,[7] and finds that defendant acquired a prescriptive easement in the

power line, such that summary judgment is warranted as to plaintiff's trespass claims.  In

---

[5] In support of its lack of exclusivity argument, BNSF cites *Dameron v. Kelsay*, No. 96,462, 2007 WL 2580598, at *6 (Kan. App. Sept. 7, 2007) (citing *Fiest v. Steere*, 175 Kan. 1, 5-7, 259 P.2d 140 (1953) as stating that "a prescriptive easement requires that the use of the land be exclusive." (Dkt. 60, at 16). This reference unfortunately omits an important qualification from *Dameron*, which wrote in full: "Adverse possession requires that the possession of the property be exclusive, while a prescriptive easement requires that the use of the land be exclusive *only to the extent the nature of the use will permit*." (Emphasis added). This is consistent with this court's conclusions above:   the City has an easement in the power line absent interference in the power line itself.

[6] In *McNeely*, the court ultimately held that no prescriptive easement arose because the court determined that under Florida law "the common law period of twenty years holds as to acquisition of a prescriptive right," and, suit having been instituted in 1957, "twenty years had not elapsed since the original clearing of the 100 foot right of way by the power corporation in 1939." 125 So.2d at 320.

[7] The City expressly argues in support of summary judgment that *res ipsa loquitor* under Kansas law is simply as standard of proof for negligence, and that KTCA immunity shields it from BNSF's claims for "negligence and/or *res ipsa loquitor*." (Dkt. 58, at 7-8). BNSF, in its Response (Dkt. 60) does not mention *res ipsa loquitor*.

light of these conclusions, the court need not address the other arguments presented by the City.

IT IS ACCORDINGLY ORDERED this day of October, 2018, that the defendant's Motion for Summary Judgment (Dkt. 57) is hereby granted.


s/ J. Thomas Marten
J. Thomas Marten, Judge